# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| WANDA WENELL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:18-CV-00098-NKL ) |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) ) |

## ORDER

Plaintiff Wanda Wenell appeals the Commissioner of Social Security's final decision denying her application for disability insurance benefits under Title II of the Social Security Act. For the reasons set forth below, the decision is reversed and the case remanded for an award of benefits.

**I.     Background**

Wenell alleges that she became disabled on May 30, 2010 due to a combination of impairments including bipolar disorder, depression, impulse control disorder, hypertension, hypothyroidism, hypoglycemia, insomnia, anxiety, and a fractured left ankle. Tr. 168. She filed her initial application for disability insurance benefits on May 21, 2014. Tr. 15, 151–54.

Wenell's application was denied on September 26, 2014. Tr. 78–83. Wenell filed an appeal on October 31, 2014. Tr. 84–85. On December 8, 2016, Wenell appeared and testified at a hearing before an administrative law judge ("ALJ"). Tr. 35–62.

On March 17, 2017, the ALJ issued an unfavorable decision. Tr. 12–28. The ALJ determined that, through the date last insured, Wenell suffered from severe impairments of bipolar

disorder, anxiety, impulse control disorder, cannabis use disorder, obesity, degenerative joint disease of the ankle status-post fracture surgery, anemia, and narcolepsy. Tr. 17. However, the ALJ found that Wenell did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925, and 416.926). Tr. 18. The ALJ found that Wenell had the residual functional capacity ("RFC") to perform light work with the following limitations:

> She can occasionally climb ramps and stairs, but never ladders, ropes, and scaffolds. The claimant can frequent[ly] balance. She can occasionally push and pull with the left lower extremity. In addition, the claimant is able to perform simple and routine tasks in a work environment free of fast-paced productivity requirements, involving simple work-related decisions with few work place changes. She is able to occasionally interact appropriately with the general public and coworkers.

Tr. 20. Based on testimony from a vocational expert ("VE"), the ALJ concluded that Wenell could perform jobs existing in significant numbers in the national economy, including work as a garment sorter (DOT 222.687-014), retail price marker (DOT 209.587-034), and mail clerk (DOT 209.687-026), and therefore is not disabled. Tr. 26–27.

The Social Security Administration's Appeals Council denied Wenell's request for review on December 19, 2017. Tr. 1. Wenell has exhausted her administrative remedies, and now appeals the ALJ's March 2017 decision, which constitutes the final decision of the Commissioner subject to judicial review.

## II. Legal Standard

In reviewing the Commissioner's denial of benefits, the Court considers whether "substantial evidence in the record as a whole supports the ALJ's decision." *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). "Substantial evidence" is less than a preponderance but enough that a reasonable mind would find it adequate to support the ALJ's conclusion. *Id*. The Court must

consider evidence that both supports and detracts from the ALJ's decision. *Id.* "[A]s long as substantial evidence in the record supports the Commissioner's decision, [the Court] may not reverse it." *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015) (citation omitted). But where the record instead "overwhelmingly supports" a finding of disability, reversal and remand for an immediate award of benefits is the appropriate remedy. *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009); *see also Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir.1984) ("Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate.").

To receive disability benefits under Title II, Wenell must establish that she was disabled before the expiration of her insured status. *See* 42 U.S.C. §§ 416(i), 423(c); *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998). Wenell's insured status expired on December 31, 2015. Tr. 27. However, evidence of a disability after that date remains relevant, "in helping to elucidate a medical condition during the time for which benefits might be rewarded." *Pyland*, 149 F.3d at 877 (citing *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989)).

## III. Discussion

Wenell argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ afforded only "minimal weight" to the opinion of her treating psychiatrist, Dr. Salau, while affording "significant weight" to the opinion of Dr. Smith, a non-examining, State agency medical consultant who reviewed Wenell's file in September 2014. Tr. 24–25.

Dr. Salau's December 2016 Medical Source Statement-Mental found that based on Wenell's impairments, she would miss four days of work per month, would be off task 25% of the time or more,[1] and would suffer marked limitations in understanding and memory, and moderate

---

[1] As indicated by the VE, either of these limitations, individually, "would be work-preclusive." Tr. 60.

3

to marked limitations in sustained concentration, persistence, social interaction, and in her ability to adapt. Tr. 630–31. Dr. Salau also found that Wenell was extremely limited in her ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 631. The ALJ, however, concluded that Dr. Salau's opinion deserved minimal weight because it "contrast[ed] sharply" with the record as a whole and "relied quite heavily on" and "seemed to uncritically accept as true most, if not all" of the "subjective report of symptoms and limitations" provided by Wenell.[2] Tr. 25.

However, an ALJ may not discount a treating source's opinion based on inconsistencies that do not actually exist, *Holden v. Astrue*, 4:10CV742 RWS FRB, 2011 WL 2730914, *37 (E.D. Mo. June 15, 2011), nor may an ALJ "pick and choose" only evidence in the record buttressing her conclusion.[3] *Taylor o/b/o McKinnies v. Barnhart*, 333 F.Supp.2d 846, 856 (E.D. Mo. 2004); *see also Briggs v. Astrue*, No. 11-CV-6039-NKL, 2012 WL 393875, at *6 (W.D. Mo. Feb. 6, 2012) (reversing ALJ determination discounting opinion of treating physician based upon selective reading of physician's treatment notes). Rather, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable diagnostic techniques and not inconsistent with the other substantial evidence in the record. SSR 96-2p, 1996 WL 374188, *5 (July 2, 1996); *see also Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). If an ALJ does

---

[2] While the Commissioner suggests that the ALJ properly discounted Dr. Salau's opinion, because it was authored one year after the date last insured, the ALJ failed to offer this as a reason for discounting Dr. Salau's opinion, nor did the ALJ address Dr. Salau's failure to answer the question regarding whether the limitations in his medical source statement had existed prior to Wenell's date of last insured. The Court cannot accept "counsel's post hoc rationalizations for agency action." *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 168–69 (1962).
[3] An ALJ is held to this standard despite not being required to discuss all of the evidence in the record. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).

4

discount a treating source's opinion, she must "give good reasons" for doing so. *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002); *see also Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) (finding ALJ can only reject medical evidence "based on contradicting medical evidence, not on the ALJ's own judgments or opinions").

Here, the ALJ based her conclusion "upon selective interpretation of isolated comments which downplayed the effects of [Wenell's] impairments without taking [Dr. Salau's] entire treatment record into context." *See Briggs*, 2012 WL 393875, at *6. The ALJ notably omitted reference to medical records showing suicidal and homicidal ideations, involuntary psychiatric admissions, medication changes and dosage increases, and manic symptoms from her decision. *Compare* Tr. 567–68 (recommending impatient admission for mood stabilization and increasing medication); 541–44 (reporting thoughts of kidnapping others and recommending involuntary admission to a psych unit), 537–40, 533–36 (reporting that Wenell "threw a fit" at the pharmacy and automated car wash), 529–32 (reporting being upset about new nurse in clinic), 525–28 (indicating elated mood, racing thoughts, and increasing Seroquel for mood stabilization), 521–24 (again increasing Seroquel for mood stabilization), 518–20 (noting "patient is considered imminently suicidal," and placing Wenell on 96 hour hold in February 2016) *with* Tr. 23–25 (ALJ decision omitting reference to any such treatment records).[4] Instead, the ALJ selectively cited examination findings, often from the same appointments or time period, indicating that Wenell

---

[4] The Commissioner asserts that the ALJ failed to address Wenell's involuntary psychiatric admissions and suicidal ideations because they occurred after the date last insured. In fact, the ALJ cited to examinations in February and December 2016. Tr. 23–24. However, in doing so, she failed to acknowledge that those examinations were conducted while Wenell was subject to or recommended for an involuntary psychiatric hold. *See id.* The ALJ's only reference to less than normal findings was a reference to Dr. Salau's December 2016 treatment notes, where the ALJ recounted normal findings "despite suicidal thoughts, a tearful affect, a depressed mood, and reported auditory hallucinations." Tr. 24.

was "observed as casually dressed, cooperative, well groomed, and oriented to time, place, and person." Tr. 25.

The ALJ also failed to mention any medical records occurring in 2015. These medical records included a March 2015 appointment with Dr. Salau in which Wenell reported brooding over "pass[ing] the death penalty" on some of her former college classmates. Tr. 541. Wenell's speech was louder than usual, she had an upset mood; labile, tearful, and angry affect; and her thought content was positive for thoughts of kidnapping her former college classmates, tying them up, and making them listen to her sufferings. Tr. 543. Dr. Salau found that Wenell was "imminently a danger to others and potentially to herself" and completed an affidavit for an involuntary admission to a psych unit. *Id.* The police were called to the clinic, but Wenell left before they arrived. *Id.*

While Wenell's homicidal thoughts subsided for a time being, she continued to report becoming upset and throwing "a fit" over small occurrences such as a mistake at the pharmacy or the presence of a new nurse in Dr. Salau's clinic. Tr. 533, 529. In September 2015, she reported doing "great," but was not sleeping well, believed her thoughts to be racing, appeared elated, and had thought content positive for increased obsessions. Tr. 528. She also reported having driven impulsively to Colorado Springs with no plans and having to sleep in a gas station. Tr. 528. In November 2015, Wenell's mood was "all over the place," she could "not shut down her mind," she could not focus, her sleep had deteriorated, she had to increase her Trazodone, and her thought content was again positive for some obsessions about cleanliness. Tr. 521–24. Dr. Salau adjusted Wenell's medications, but in February 2016, Dr. Salau again completed an affidavit for a 96 hour hold after Wenell appeared imminently suicidal and with impaired judgment. Tr. 518–20. Dr. Salau's notes indicate that Wenell reported thinking about ways of ending her life that would

6

disguise the fact that it was a suicide, including paying a hitman to shoot her and overdosing on heroin. Tr. 518.

The ALJ mentioned none of these records from Dr. Salau, instead noting that during a February 2016 mental status examination, Wenell "was observed as cooperative with no psychomotor agitation, fair insight and judgment, a fair distant, recent, and immediate memory, no hallucinations, no delusions, orientation to person, place, and time, no impairment of cognition, and no evidence of psychosis." Tr. 23. The ALJ failed to acknowledge, however, that this examination was made in the context of an involuntary admission, because Wenell was imminently suicidal, or that it was determined during the same examination that Wenell needed to be hospitalized for further evaluation and treatment. Tr. 23, 639.

In addition to overlooking these less than normal treatment notations, the ALJ similarly omitted reference to Wenell's later hospitalizations. For example, although the ALJ cited a December 2016 appointment showing Wenell to be "fairly groomed, kempt, and normoactive" with "normal speech, goal directed thought processes, no formal thought disorder, no delusions or grandiosity, no homicidal ideations, intact attention, intact concentration, partial insight, improved judgment, and average intelligence," the ALJ failed to acknowledge Wenell's reports from the same appointment of feeling hopeless, not sleeping well, hearing voices saying that "death is good," feeling like "hitting people with her car," and being unsure of whether she was alive or dead. Tr. 24, 641–44. The ALJ also ignored Dr. Salau's treatment notes, which identified Wenell as requiring admission under an additional 96 hour hold given Wenell's "acute deterioration and risk of harm to self and others." Tr. 643.

Although Wenell's February and December 2016 hospitalizations came after Wenell's insured status expired on December 31, 2015, such evidence remains relevant in "helping to

elucidate [her] medical condition during the time for which benefits might be rewarded." *See Pyland*, 149 F.3d at 877. Dr. Salau's opinion and treatment notes reflect a continuation of symptoms and limitations noted by Dr. Salau and others prior to Wenell's date of last insured. For example, treatment records from Pathways, before Wenell began seeing Dr. Salau, similarly note that Wenell required medication adjustments to deal with "excessive disfiguring skin picking," mood instability, and impulse control related to her diagnosed Bipolar 2 and impulse control disorders. Tr. 410, 581–83, 578–80. Even the consultative examiner, who had access to only some of Wenell's treatment records, recorded observations in 2014 consistent with those of Dr. Salau—Wenell's mood was dysphoric; she was tearful; and she reported thought content positive for paranoid, suicidal, and homicidal ideation. Tr. 486–87. The consultative examiner also noted that Wenell made a mistake when asked to repeat six digits forward; made four errors with performing serial 3's; had limited judgment during manic phases; and continued to experience psychiatric symptoms, even with psychotropic medication. *Id.*

The ALJ also offered no support for her conclusion that Dr. Salau relied quite heavily on Wenell's subjective report of symptoms and limitations rather than medical history, including treatment and response, clinical findings, diagnosis, and prognosis in formulating his opinion. *See Bollmeyer v. Astrue*, No. 10-3266-CV-NKL, 2011 WL 1769790, at *8–9 (W.D. Mo. May 9, 2011) (remanding where ALJ resorted to boilerplate language that treating sources relied quite heavily on the subjective reports of the claimant to discredit their opinions); *see also Putnam v. Colvin*, No. 6:14-CV-03024-NKL, 2014 WL 5320947, *4 (W.D. Mo. Oct. 17, 2014) (remanding where ALJ pointed to no evidence in the record to show that the doctor's opinions were based on subjective complaints rather than medical history, diagnoses, and treatment). The fact that Dr. Salau's evaluations were based on his sessions with Wenell in which she discussed her feelings

8

and symptoms does not mean that Dr. Salau's opinion constitutes a wholesale adoption of Wenell's complaints. Contrary to the ALJ's conclusion, Dr. Salau's opinion indicates that he relied on Wenell's medical history, clinical findings, diagnosis, treatment prescribed with response, and prognosis in formulating his opinion. Tr. 631. When Dr. Salau provided his opinion in December 2016, he had treated Wenell on a regular basis for over two years; that treatment included prescribing and adjusting Wenell's medications, hospital admissions due to suicidal/homicidal ideations, and extensive treatment recommendations. Tr. 537, 541, 565, 641.

Wenell also argues that the ALJ afforded too much weight to the opinion of the non-examining State agency consultant, Dr. Smith. In September 2014, Dr. Smith found that Wenell had mild limitations in activities of daily living, moderate limitations in social functioning and maintaining concentration, persistence, or pace, and no episodes of decompensation. Tr. 25, 70–72. Dr. Smith found that, at that time, Wenell was able to carry out simple work instructions and perform routine tasks in settings that do not require frequent changes in routine. *Id.*

However, the opinion of a consulting physician who examines a claimant once, or not at all, does not generally constitute substantial evidence. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). Dr. Smith's 2014 opinion was based on one consultative examination, also from September 2014, and mental health treatment records that ended in February 2013. Tr. 69. Dr. Smith did not have access to any of Dr. Salau's treatment records. In other words, Dr. Smith not only lacked the benefit of a treating relationship with Wenell, but did not have access to the majority of relevant mental health treatment records. *See Hilburn v. Colvin*, No. 6:14-CV-03409-MDH, 2016 WL 356045, *2 (W.D. Mo. Jan. 29, 2016) (finding substantial evidence lacking where ALJ relied on opinion of a non-examining doctor who lacked access to the majority of the claimant's mental health treatment). Medical records received after Dr. Smith completed his

evaluation show a worsening in Wenell's condition, causing her treating doctor to recommend hospitalization, Tr. 567, change her medications, Tr. 560, complete affidavits for involuntary commitment, Tr. 543, and opine that Wenell suffered from marked to extreme limitations, Tr. 630–32. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995) (remanding where updated evidence reflected a "marked change" in the claimant's condition); *see also Brown v. Colvin*, No. 4:14-CV-00288-NKL, 2014 WL 6750041, at *3–4 (W.D. Mo. Dec. 1, 2014) (requiring remand when ALJ relied on State agency consultant's opinion that failed to consider subsequent medical records inconsistent with her opinion).

The findings of Dr. Smith cannot be reasonably adopted in determining the RFC when they conflict with the findings of treating psychiatrist Dr. Salau—which are amply supported by the medical record. *See Briggs*, 2012 WL 393875, at *7. The VE agreed that a person with Wenell's mental health limitations as described by Dr. Salau would not be able to work. Tr. 60. Because the evidence overwhelmingly supports a finding of disability, the decision is reversed, and the case remanded for an award of benefits.

### III. Conclusion

The Commissioner's determination is REVERSED. Benefits shall be awarded. The matter is remanded for further proceedings consistent with this Order.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: September 5, 2018
Jefferson City, Missouri